J-S18001-22
J-S18002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 346 MDA 2022 |

Appeal from the Decree Entered January 20, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9035

| | | |
|---|---|---|
| IN THE INT. OF: R.E.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.A.W., NATURAL FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 347 MDA 2022 |

Appeal from the Decree Entered January 20, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9036

| | | |
|---|---|---|
| IN THE INTEREST OF: C.A.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 348 MDA 2022 |

Appeal from the Decree Entered January 20, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9033

J-S18001-22
J-S18002-22

| IN THE INTEREST OF: J.S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: J.M.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 349 MDA 2022 |

Appeal from the Decree Entered January 20, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9034

| IN THE INTEREST OF: K.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: J.M.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 350 MDA 2022 |

Appeal from the Decree Entered January 20, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9035

| IN THE INTEREST OF: R.E.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: J.M.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 351 MDA 2022 |

Appeal from the Decree Entered January 20, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9036

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: AUGUST 11, 2022**

- 2 -

J.M.C. ("Mother") and J.A.W. ("Father") appeal from the decrees entered on January 20, 2022, which granted the petitions filed by the Luzerne County Children and Youth Services ("CYS"), to involuntarily terminate their parental rights to Mother's four minor children and Father's two minor children, pursuant to sections 2511(a)(8), (9), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]  After careful review of the record and applicable law, we affirm.

The orphans' court issued the following findings of fact in its Pa.R.A.P. 1925(a) opinion:

> There are four children in this case[:] K.A.W., R.E.W., C.A.C.[,] and J.S.C. [(collectively the "Children")].  The minor child, K.A.W.[,] was born [in] August [of] 2013 and is currently eight (8) years old.  The minor child, R.E.W.[,] was born [in] August [of] 2014 and is currently seven (7) years old.  The minor child, C.A.C.[,] was born [in] September [of] 2008 and is currently thirteen (13) years old.  The minor child, J.S.C.[,] was born [in] July [of] 2007 and is currently fourteen (14) years old.
>
> It is unrebutted that the … [C]hildren have been in placement and therefore removed from the care of Mother and Father since January 15, 2018.  The date of placement of the [C]hildren was on or around January 15, 2018.  The reasons for placement of the [C]hildren were deplorable housing and physical abuse to the [C]hildren.  There were allegations that [Father] … was physically abusing the [C]hildren by burning their bodies with cigarettes.  There were additional allegations that both Mother and Father engaged in physical abuse by hitting the [C]hildren with clothes hangers.

Orphans' Court Opinion ("OCO"), 3/31/22, at 4-5 (citations to record omitted).

---

[1] For ease of disposition, we consolidate the appeals at Nos. 346-347 and 348-351 MDA 2022 *sua sponte*, as the issues in both matters involve the same parties and are closely related.

The orphans' court further summarized the procedural history of this matter as follows:

> On June 8, 2020, [CYS] filed petitions for the involuntary termination of parental rights … as to the minor [C]hildren, … in addition to conducting a permanency review and a goal change hearing before the court. The hearings took place on September 10, 2020, December 1, 2020, December 21, 2020, February 8, 2021, April 28, 2021, June 1, 2021[,] and July 12, 2021. The first four hearings (commencing on September 10, 2020[,] and concluding on February 8, 2021) pertained to the termination of [Mother's and Father's] parental rights. The remaining hearings (commencing on April 28, 2021[,] and concluding on July 12, 2021) pertained to issues concerning goal change and permanency reviews. With respect to [Mother's and Father's] parental rights to the [C]hildren, [CYS] filed a petition to terminate the parental rights of [Father], [the natural] father of K.A.W. and R.E.W.; the parental rights of D.J.S., [the natural] father of J.S.C.; and the parental rights of B.S.C., the putative father of C.A.C. and putative father of the remaining three minor children. On September 10, 2020, B.S.C. knowingly, willingly[,] and voluntarily relinquished his parental rights to all of the minor [C]hildren.
>
> On January 18, 2022, this court issued decrees terminating the parental rights of [Mother] as to all four … [C]hildren, the parental rights of the natural father of J.S.C., the parental rights of [Father as to] K.A.W. and R.E.W.[,] and the parental rights of the putative father of C.A.C. and putative father of the remaining children. Mother's parental rights were terminated pursuant to 23 Pa.C.S.[] §[]2511(a)(8)…. Father's parental rights as to K.A.W. and R.E.W. were terminated pursuant to 23 Pa.C.S.[] §[]2511(a)(9)…. In entering these termination decrees, the court gave primary consideration to the developmental, physical, and emotional needs and welfare of the [C]hildren pursuant to 23 Pa.C.S.[] §[]2511(b).

**Id.** at 2-3 (unnecessary capitalization omitted).

- 4 -

Mother and Father filed separate, timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother raises the following issues on appeal:

> I. Whether the [orphans'] court abused its discretion, committed an error of law[,] and/or there was insufficient, evidentiary support for its finding that [Mother's] parental rights should be terminated pursuant to 23 Pa.C.S.[ §] 2511(a)(8)[?]
>
> II. Whether the [orphans'] court abused its discretion, committed an error of law[,] and/or there was insufficient evidentiary support for its finding pursuant to 23 Pa.C.S.[ §] 2511(b) that it is in the best interest of the minor Children to grant the termination of [Mother's] parental rights[?]

Mother's Brief at 5. Additionally, Father presents the following issues for our review:

> [I.] Whether the [orphans' c]ourt abused its discretion and/or committed an error of law in determining the parental rights of [Father] to the subject minor children, K.A.W. and R.E.W., should be terminated pursuant to 23 Pa.C.S.[] § 2511(a)(9)[?]
>
> [II.] Whether the [orphans' c]ourt abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.[] § 2511(b) have been satisfied and the best interests of the subject minor children, K.A.W. and R.E.W., [have been] served by terminating the parental rights of [Father?]

Father's Brief at 6.

We review the instant appeal from the termination of Mother's and Father's parental rights mindful of the following principles:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support

- 5 -

for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the

- 6 -

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Herein, we review the decrees pursuant to sections 2511(a)(8), (9), and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an

agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(9) The parent has been convicted of one of the following in which the victim was a child of the parent:

(i) an offense under 18 Pa.C.S. Ch. 25 (relating to criminal homicide);

(ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault);

(iii) an offense in another jurisdiction equivalent to an offense in subparagraph (i) or (ii); or

(iv) an attempt, solicitation[,] or conspiracy to commit an offense in subparagraph (i), (ii)[,] or (iii).

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (9), and (b).

We first address whether the orphans' court abused its discretion by terminating the parental rights of Father pursuant to section 2511(a)(9). In support of its determination, the orphans' court opined:

Father's parental rights as to … K.A.W. and R.E.W.[] may be terminated under 23 Pa.C.S. §[]2511(a)(9). [] Father committed a felony under 18 Pa.C.S. §[]2702 relating to aggravated assault.

- 8 -

Specifically, Father pleaded guilty on October 15, 2019[,] to a felony charge of aggravated assault under 18 Pa.C.S. §[]2702.

[Section] … 2702(a)(8) states that a person is guilty of aggravated assault if that person attempts to cause or intentionally, knowingly[,] or recklessly causes bodily injury to a child less than six (6) years of age, by a person 18 years of age or older.

Attorney [Brittany] Quinn testified that she works for the Luzerne County District Attorneys' office as an assistant district attorney. Attorney Quinn indicated that she prosecuted the criminal case against [Father]….  Attorney Quinn indicated that at the time of the assault, the minor child[,] K.A.W.[,] was four (4) years old and the minor child, R.E.W., was three (3) years old.  Attorney Quinn testified that the criminal complaint indicated that Father … was causing bodily injury to his two biological children, K.A.W. and R.E.W.[,] by placing lit cigarettes on [their] backs.  Attorney Quinn further indicated that it was verified through a child advocacy center interview and examination that [K.A.W. and R.E.W.] had cigarette burns on their backs consistent with [K.A.W.'s and R.E.W.'s] disclosures regarding their injuries.  Attorney Quinn indicated that the affidavit of probable cause was collective of the abuse of all four of the [C]hildren.  Attorney Quinn stated that on October 15, 2019, Father entered a guilty plea in his case.  Father pleaded guilty to one count of strangulation, an aggravated assault charge of a child under six (6) years old[,] and pleaded guilty to endangering the welfare of children, a felony of the third degree.  Pursuant to the plea agreement that was entered, Father acknowledged that he committed the aggravated assault against the minor children, K.A.W. and R.E.W.[,] who were both under six (6) years of age.

Upon cross-examination, Attorney Quinn was questioned regarding the criminal information and only one child being listed on the original criminal information.  Attorney Quinn explained that even[] though the facts in the criminal complaint are listed once, the counts addressed each child.  Attorney Quinn also explained that as the plea bargain process continued, the agreement reached contained one plea to one count involving both children.

Therefore, due to Father['s] pleading guilty to a felony under … 18 Pa.C.S. §[]2702 relating to aggravated assault of his two minor children, K.A.W. and R.E.W., … Father's parental rights may be terminated pursuant to 23 Pa.C.S.[] §[]2511(a)(9).

OCO at 7-8 (citations to record omitted).

Father acknowledges that he pleaded guilty to a qualifying crime under section 2511(a)(9). Father's Brief at 10. He submits, however, that the orphans' court abused its discretion in not considering the context in which Father entered such plea, "especially in light of the discretionary aspect of the statute." *Id.* (citing 23 Pa.C.S. § 2511(a)(9) (stating, in relevant part, "[t]he rights of a parent in regard to a child **may** be terminated…") (emphasis added)). More specifically, Father argues that it was incumbent on the orphans' court to consider the following:

> In … May [of] 2018, [Father] was incarcerated at the Luzerne County Correctional Facility predicated upon the alleged events giving rise to the underlying dependency proceeding. Following his incarceration, and despite the fact [Father] had been "very cooperative" and "started off on a good track[,"] CYS personnel essentially ignored him by meeting with him on only one or two occasions. Importantly, however, one such meeting was occasioned by the need of Katie Neubauer, the family's then-acting CYS caseworker, to discuss certain emergent health needs of [Father's] daughter, K.A.W. Ms. Neubauer made it abundantly clear that K.A.W. was in crisis and that only [Father's] direct intervention could supply the relief necessary to address her significant mental health concerns. Fearful for his daughter's safety and well-being, [Father] elected to forego the criminal trial to which he was otherwise entitled and enter a negotiated plea in the hopes of being quickly released. As he credibly testified, this was the sole reason for which he entered a plea to a felony aggravated assault charge. Indeed, it was his reasonable belief—a belief impressed upon him by Ms. Neubauer—that resolving said charges would be his only means of being released, thereby allowing him to make direct and immediate efforts to resolve his daughter's mental health issues. And but for CYS's intervention and statements regarding the dire nature of his daughter's mental health status, [Father] would have gone to trial regarding the criminal charges lodged against him.

- 10 -

> … [I]t is the trial court's obligation to examine the individual circumstances of each and every case and consider all explanations offered to determine if the evidence—*in light of the totality of circumstances*—clearly warrants termination of parental rights. **In re Julissa O.**, 746 A.2d 1137 (Pa. Super. 2000) (emphasis added). In the instant matter, it cannot be denied that [Father] pleaded guilty to felony aggravated assault pursuant to 18 Pa.C.S. § 2702. Unfortunately, the trial court ended its analysis there. Had it considered the context in which such plea was entered, the outcome of this matter may have been very different. Thus, given that the trial court failed to consider the "totality of [Father's] circumstances"—or, at the very least, there is no suggestion in its memorandum that such consideration was afforded—[Father] respectfully submits the involuntary termination of his parental rights pursuant to 23 Pa.C.S. § 2511(a)(9) was the product of an abuse of discretion or error of law.

Father's Brief at 10-12 (citations to record and unnecessary capitalization omitted; emphasis in original). Father fails to convince us that he is entitled to any relief on this claim.

Contrary to Father's argument, section 2511(a)(9)(ii) does not impose any duty on the court to consider the context in which Father entered his guilty plea to a qualifying crime. The plain language of the statute requires **only** the conviction of a felony under 18 Pa.C.S. § 2702. **See** 23 Pa.C.S. § 2511(a)(9)(ii). **See also Commonwealth v. Hale**, 85 A.3d 570, 581-82 (Pa. Super. 2014) (recognizing that the term "conviction" is generally understood, for legal purposes, to refer to a judgment of sentence entered after a finding of guilt or entry of a plea). Instantly, Father pleaded guilty to, *inter alia*, one charge of aggravated assault to a child less than six years of age (18 Pa.C.S. § 2702(a)(8)). **See** N.T., 12/1/20, at 16 (Attorney Quinn's testifying regarding Father's guilty plea and his sentencing by the court); N.T., 2/2/21,

- 11 -

at 93 (Father's acknowledging his guilty plea).  The Luzerne County Court of Common Pleas accepted Father's plea and sentenced him accordingly.  ***See*** Petition for Termination of Father's Parental Rights, 6/8/20, at Exhibit "A" ("Sentencing Order").  Moreover, we note that Father's conviction stemmed from the alleged abuse of his biological children, K.A.W. and R.E.W., as outlined by CYS in its termination petition.  ***See*** N.T., 12/1/21, at 15-17 (Attorney Quinn's testifying that Father stipulated to all the charges asserted by the Commonwealth in its affidavit of probable cause attached to the criminal complaint, which included Father's putting out lit cigarettes on the backs of K.A.W. and R.E.W.).

Father's reasoning for pleading guilty is irrelevant in the present matter.  "Once a defendant enters a guilty plea, it is presumed that he was aware of what he was doing.  Consequently, defendants are bound by statements they make during their guilty plea colloquies and may not successfully assert any claims that contradict those statements."  ***Commonwealth v. Culsoir***, 209 A.3d 433, 437 (Pa. Super. 2019) (citations omitted).  Here, Attorney Quinn testified that the sentencing judge conducted an extensive colloquy at the time of Father's plea.  ***See*** N.T., 12/1/20, at 17.  Father pleaded guilty and was sentenced by the court on October 15, 2019. ***See*** Sentencing Order (single page).  The record is devoid of any evidence that Father ever requested a withdrawal of his guilty plea and/or appealed the Sentencing Order.  ***See*** CYS's Brief at 11 (noting that Father "has never filed an appeal to the criminal conviction for the felony aggravated assault upon his two minor children").

Father cannot now attempt to escape the effects of his guilty plea on his parental rights by suggesting that "but for" CYS's statements regarding his daughter's mental health, he would not have entered the plea. Thus, we conclude that the termination of Father's parental rights under 2511(a)(9) was warranted. We discern no abuse of discretion on the part of the orphans' court, and we deem its decision to be supported by the record.

Next, we address whether the orphans' court abused its discretion by terminating the parental rights of Mother pursuant to section 2511(a)(8).

> "[T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." **In re Adoption of M.E.P.**, 825 A.2d 1226, 1275-76 (Pa. Super. 2003); 23 Pa.C.S.[] § 2511(a)(8). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable[,] good faith efforts of the [a]gency supplied over a realistic time period. **Id.** Termination under Section 2511(a)(8) does **not** require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [a]gency services. **In re Adoption of T.B.B.**, 835 A.2d 387, 396 (Pa. Super. 2003); **In re Adoption of M.E.P.**, **supra**.

**In re Z.P.**, 994 A.2d 1108, 1118 (Pa. Super. 2010) (emphasis added).

Here, Mother asserts that the orphans' court erred in terminating her parental rights pursuant to section 2511(a)(8). Mother's Brief at 9. Specifically, she argues that there was insufficient evidentiary support for the

orphans' court's findings that: (1) Mother failed to remedy her mental health and substance abuse issues and that she failed to complete her parenting education without concerns; (2) Mother failed to take responsibility for any of the physical abuse that the Children suffered under her care; and (3) the developmental, physical, and emotional needs and welfare of the Children will be served by the termination of Mother's parental rights. *Id.* at 9-10 (footnotes omitted). The record clearly belies Mother's claim.

First, it is undisputed that the Children have been removed from Mother's care since January 15, 2018, which well exceeds the twelve-month requirement imposed by the first element of section 2511(a)(8). *See* OCO at 11. Thus, this prong has clearly been met.

As to the second element of section 2511(a)(8), regarding whether the conditions which led to the Children's removal continue to exist, the record indicates that the Children were placed in foster care due to concerns with deplorable housing conditions, physical abuse to the Children, and Mother's substance abuse and mental health issues. *See* OCO at 11- 12. CYS produced overwhelming evidence in support of its argument that these conditions still existed at the time of the termination hearing. For instance, Katie Neubauer, a former caseworker for CYS, testified to the following:

> [T]he allegations were that … [F]ather … was physically abusing his two children by placing lit cigarettes upon their bodies. There were additional allegations … which addressed Mother and Father hitting the [C]hildren with plastic clothes hangers. Mother also admitted to hitting the [C]hildren without the use of a hanger…. [T]here were also allegations that Mother was aware of the abuse perpetrated upon the [C]hildren by [Father,] and [she] did not

take steps to protect the [C]hildren.  Ms. Neubauer stated that the [C]hildren were therefore adjudicated dependent and a family service plan [("FSP")] was formed and adopted as a court order. [Mother and Father] were to engage in services in order to achieve reunification with their … [C]hildren.  Ms. Neubauer testified that Mother was court[-]ordered to participate in parenting education, mental health treatment[,] and to obtain safe and stable housing. [She] further stated that subsequent to the dependency hearing, there were allegations that Mother was using Father's prescription medication and consuming alcohol to excess.  Therefore, substance abuse services were also added to Mother's [FSP].

Ms. Neubauer testified that both Mother and Father were engaged in [a] parenting education program at an agency known as "Concern."  Mother was also participating in mental health treatment at Community Counseling….  Mother later followed [Alicia] Singer from Community Counseling to the Robinson Counseling Center for additional mental health treatment.  With respect to drug and alcohol services, Mother first scheduled an intake session at []A Better Today[] in Hazleton, Pennsylvania, but did not follow through with treatment at that facility.  Mother did not engage in treatment for some time.  Eventually, Mother was involved in Wyoming Valley Alcohol and Drug Services and attended multiple sessions at the beginning of her treatment there, but [she] was inconsistent as treatment progressed.  Ms. Neubauer testified that she was no longer the caseworker for Mother toward the end of February 2020.

Ms. Neubauer further testified that Mother was required to submit to toxicology screens pursuant to the color call[-]in system, a "color system" which requires an individual to submit to testing if he/she phones [CYS] and his/her color is indicated on any given day.  Ms. Neubauer revealed that Mother only took seven (7) toxicology screens out of the sixty-seven (67) or sixty-eight (68) times that she was requested to submit to the screens.  According to Ms. Neubauer, Mother was inconsistent with all of her court[-]ordered services.  She described Mother as someone who came across as a willing person, but then would not follow through with the services and [would] stop attending.  Mother would re-engage and then again stop attending.  Ms. Neubauer stated that throughout the time that she worked with Mother, Mother moved from place to place either with a friend, in a shelter or with a boyfriend.  Ms. Neubauer testified that throughout the time that she worked with Mother, Mother never accepted responsibility for the placement of the [C]hildren.

- 15 -

Ms. Neubauer indicated that although Mother was consistent with her visits with the minor [C]hildren, she never progressed to having unsupervised visits with [them]. Ms. Neubauer indicated that Mother had inappropriate conversations with the [C]hildren by telling them that she had a new boyfriend and that she was spending time with his children. Ms. Nebauer stated that J.S.C. reacted to his Mother's story by curling up in a blanket and pretending to have a bellyache. Ms. Neubauer had to warn Mother not to have these adult conversations with the [C]hildren.

When Ms. Neubauer was questioned as to whether she attempted to help Mother obtain housing, Ms. Neubauer responded that she tells all parents with dependent children that as soon as they complete their services involving substance abuse treatment and/or progress in mental health treatment, then she would [*sic*] help them obtain housing. However, according to Ms. Neubauer, Mother did not complete the drug and alcohol treatment nor progress in her mental health treatment for Ms. Neubauer to help her with housing. With respect to the urinalysis screening, Ms. Neubauer stated that Mother told her that the reasons she did not submit to the remaining screens was that she did not feel "comfortable" submitting to screens in the Wilkes-Barre location because she was being watched while taking her test. She stated that at the Hazleton location, no one watched her when she submitted to the test.

Ms. Neubauer stated that Mother admitted to her that she had a substance abuse problem. Mother acknowledged throwing bottles of alcohol down the sink because she was concerned about her substance abuse problem. Mother also admitted to using [Father's] … prescription medications while consuming alcohol at the same time. Mother also admitted to domestic violence taking place between her and [Father] while they were both under the influence of alcohol.

When Ms. Neubauer was questioned as to whether Mother finally accepted responsibility for any of the reasons for placement of the [C]hildren, Ms. Neubauer's response was that Mother had not acknowledged how the physical abuse had effected herself and her Children. Ms. Neubauer stated that Mother indicated to her that she wanted … [F]ather … to become an active part of the [C]hildren's lives again. Mother at the time was focusing on finding housing and obtaining counseling for herself and the [C]hildren.

OCO at 11-14 (citations to record and unnecessary capitalization omitted).

Additionally, Alena Gulich, a clinical supervisor and counselor at A Better Today, an outpatient substance abuse treatment facility, testified that Mother was compliant with her drug and alcohol treatment at the facility from July 30, 2018, through October 11, 2018, when she moved out of the Hazelton, Pennsylvania area and relocated to Wilkes-Barre, Pennsylvania. *Id.* at 15. Mother was scheduled to re-engage at a facility in the Wilkes-Barre area on January 31, 2019; however, she did not appear for her appointment and has not engaged with the program since. *Id.*

Scott Carey, a treatment supervisor at Wyoming Valley Alcohol and Drug Services, indicated that his facility received a referral from CYS for Mother to participate in services beginning in March of 2019. *Id.* at 16. Mother failed to appear for her first appointment on March 6, 2019. She subsequently completed an assessment on April 24, 2019, during which she was diagnosed with alcohol use disorder and cannabis use disorder. Mother was recommended to attend biweekly individual outpatient sessions for substance use related issues. After missing two appointments for counseling sessions, on June 3, 2019 and August 3, 2019, Mother was considered unsuccessfully discharged. *Id.* Mother returned for another evaluation on November 25, 2019, and she was recommended for the same level of care. Again, Mother failed to comply and was unsuccessfully discharged due to missing "many appointments." *Id.*

Chyann Phillips, a caseworker at Concern, testified that Mother was referred by CYS to Concern in March of 2018 and engaged in its Intensive Family Reunification Services Program. *Id.* at 17. On April 12, 2018, the goals set for Mother were "to develop a parenting style, establish safe and stable housing[,] and obtain employment." *Id.* Ms. Phillips met with Mother from April 12, 2018, until February 11, 2019. *Id.* According to Ms. Phillips,

> Mother understood the goals that she needed to reach and understood the concerns that Ms. Phillips had regarding Father…. Mother completed the parenting program in September [of] 2018. However, … [she] did not achieve all the goals set for her in the program. Ms. Phillips indicated that she still had concerns[,] as Mother was not consistent with maintaining employment. Mother did not have housing, but instead lived in a homeless shelter. Additionally, Mother still needed to work through her emotional barriers through therapy and [to] remove negative influences from her life. Therefore, Ms. Phillips stated that although Mother completed the parenting program successfully, she completed the program with remaining concerns.

*Id.* at 17-18. Moreover, Ms. Phillips indicated that

> Mother did not accept responsibility for endangering the welfare of the [C]hildren. Upon being questioned [during] cross[-]examination as to the reason the referral were [*sic*] made by [CYS], Ms. Phillips replied that the referrals were made due to the bodily injury perpetrated upon the [C]hildren by the parents. Ms. Phillips stated that Mother did not attempt to stop or prevent the abuse. Ms. Phillips testified that when it concerned [Father] …, Mother was not consistent in believing that [he] injured the [C]hildren. Mother did not indicate how she would change things to make it safer for the [C]hildren or [to] remove the [C]hildren from dangerous situations.

*Id.* at 18. Housing instability also remained an issue. *Id.* Ms. Phillips discussed her concerns with Mother in April of 2018 and reported that, ten

months later, Mother still had not obtained housing or stable employment and was living in a shelter.  *Id.*

On April 4, 2019, Family Services Association received a referral from CYS for Mother to engage in its Intensive Family Reunification Services Program.  Case worker, Michelle Lutinski, met with Mother on May 10, 2019, to conduct an initial assessment.  *Id.* at 19.  Ms. Lutinski's concerns regarding Mother were "her lack of employment, lack of adequate housing[,] and inappropriate use of discipline with the [C]hildren."  *Id.*  Four goals were developed for Mother: (1) to obtain and maintain housing and employment; (2) to gain an understanding of healthy relationships and the way personal decisions may have an impact on the Children and parenting; (3) to maintain sobriety and to understand substance abuse, physical abuse, and parenting abilities; (4) to enhance positive decision-making skills and to understand child safety.  *Id.*  Ms. Lutinski testified that Mother engaged in the program for one year, but that she did not achieve all of her goals.  *Id.* at 20.

> According to Ms. Lutinski, Mother did not obtain and maintain housing, nor did she achieve employment.  Ms. Lutinski stated that although Mother was self-reporting that she was substance[-]abuse[-]free, Mother was not always complying with submitting to her drug screens.  Ms. Lutinski further stated that enhancement of decision[-]making skills was also not satisfactorily completed due to Mother['s] not having consistency with other service providers.
>
> … [I]n June 2020, Mother was living in New York in a shelter and was unemployed.  Therefore, Ms. Lutinski still had concerns with respect to the [C]hildren's stability.  Ms. Lutinski testified that Mother admitted toward the end of the program that she needed help with the [C]hildren and that she did not have the support that she needed.  However, she did not admit to her having any role

in the abuse of the [C]hildren. Ms. Lutinski indicated that there was a discussion with Mother regarding the abuse of the [C]hildren by [Father] …. Mother did not take any responsibility for any role in knowing that the abuse happened to the [C]hildren. According to Ms. Lutinski, Mother acknowledged that her relationship with … Father was not a healthy relationship; however, she still did not take any responsibility for her complacency in the abuse that the [C]hildren endured.

*Id.* at 20-21 (citations to record omitted).

Regarding Mother's mental health, CYS produced evidence that Mother was diagnosed with major depressive disorder and adjustment disorder with anxiety and depressed mood. Mother was evaluated at Community Counseling Services, an outpatient mental health clinic in Wilkes-Barre, Pennsylvania, in June of 2018, and was recommended to have medication management and individual therapy. *See id.* at 21 (summarizing the testimony of John Rosengrant, manager of the outpatient department at Community Counseling Services, regarding Mother's treatment). Mr. Rosengrant indicated that Mother was consistent with attending therapy and medication management in the beginning, but that she missed her last scheduled appointment on March 19, 2020, and that she has had no contact with Community Counseling Services since that date. *Id.*

On June 20, 2019, Mother began counseling services with Alicia Singer, a therapist at the Robinson Counseling Center. *Id.* at 22. Mother was to meet with Ms. Singer on a monthly basis, but never appeared for another appointment after her June 20, 2019 intake session. *Id.* Eventually, Mother was discharged from the Robinson Counseling Center for noncompliance with

services. *Id.* at 23. Mother also attended multiple sessions with a psychiatrist at Northeast Counseling Services, beginning in March of 2020, until May of 2020, when Mother indicated that she was moving to New York. *See id.* (summarizing the testimony of Chaz Schnappauf, coordinator of adult outpatient services at Northeast Counseling Services, regarding Mother's treatment). Mr. Schnappauf indicated that "Mother made substantial progress with insight development and understood poor decisions that she made in the past. However, [he] did not have any record of any therapy provided to Mother involving her past decisions concerning the [C]hildren." *Id.*

Caseworker Angelica Beaver also testified on behalf of CYS. Ms. Beaver indicated that, in addition to obtaining safe and stable housing, Mother was also required to engage in mental health treatment, parenting education, substance abuse treatment, random urinalysis, and domestic violence counseling. *Id.* at 24. According to Ms. Beaver,

> Mother completed two parenting courses; however, [she] was closed out of these courses with concerns from the providers. Ms. Beaver stated that Mother failed to consistently engage in mental health treatment and drug and alcohol services. In addition, Mother failed to participate in domestic violence counseling and failed to obtain safe and stable housing.

> Ms. Beaver stated that, at the time of [the] hearing[,] the [C]hildren [had] been in placement for three years. Ms. Beaver testified that Mother was residing in a homeless shelter called "the Cambridge Hotel" located in New York, New York. Ms. Beaver testified that she did not believe that Mother had progressed to the point [of] being able to take care of her [C]hildren. According to Ms. Beaver, the reasons for placement have not been remedied by Mother. Ms. Beaver reasoned that to this date, Mother still has not acknowledged or taken any accountability for the abuse that the [C]hildren have suffered. Mother also failed to obtain safe and

stable housing for the [C]hildren, failed to maintain employment[,] and failed to engage in court[-]ordered services. Mother also indicated to providers that she did not feel a bond with the [C]hildren, nor was she sure that she wanted to be reunified with [them].

Ms. Beaver further stated that Mother was not consistent with her visits with the [C]hildren. [She] indicated that Mother failed to consistently telephone her [C]hildren on the scheduled times. Ms. Beaver stated that Mother seemed to always be busy with other matters during the video calls and failed to engage with the [C]hildren during the calls.

Ms. Beaver indicated that Mother was not consistent with the in-person visits that she had with her [C]hildren. [She] testified that Mother attended two out of five or six visits with the [C]hildren. Mother also failed to confirm a visit with Concern[,] causing the [C]oncern agency to cancel the visit. Mother was then closed out of Concern.

Ms. Beaver further stated that Mother also was not consistent in keeping [in] contact with her. Furthermore, Mother was not agreeable to signing releases with [CYS] so that the agency could gain information regarding her services. Ms. Beaver stated that [CYS] had a difficult time obtaining signed releases from Mother.

*Id.* at 24-25 (citations to record omitted). Based on the foregoing, the orphans' court concluded that CYS met its burden in proving that the conditions which led to Children's removal continue to exist. *Id.* at 26. We discern no abuse of discretion or error of law regarding the orphans' court's decision and, thus, we determine that the second prong of section 2511(a)(8) has been satisfied.

Finally, as to the third element of section 2511(a)(8), concerning whether termination of parental rights would best serve the needs and welfare of the Children, the orphans' court opined:

[CYS] presented credible testimony regarding the needs, welfare and best interest of the minor [C]hildren in relation to their

- 22 -

Mother. Ms. Beaver, the caseworker for [CYS], testified that she became involved in the case in April 2020. Ms. Beaver testified that all four minor [C]hildren have been residing with the foster parents since April 17, 2018[,] and have become assimilated into the home and into the family. Ms. Beaver testified that the four [C]hildren have gone on family trips with the [foster] family. They also have a positive relationship with the foster parents' children. Ms. Beaver indicated that the foster mother reads to the [C]hildren every night before bedtime. The foster parents also have birthday parties and birthday dinners for the [C]hildren.

Ms. Beaver testified that the foster parents provide for the [C]hildren's physical needs. They provide the [C]hildren with food, clothing[,] and shelter. The foster parents' home is also a safe environment for the [C]hildren. The minor [C]hildren are also up to date with their medical appointments.

Ms. Beaver testified that the foster parents also meet the [C]hildren's developmental needs. The [C]hildren are provided with age-appropriate toys and activities. The [C]hildren are also involved in extracurricular activities[,] such as dance and Taekwondo. The two minor [C]hildren, J.S.C. and C.A.C.[,] are always reading books with the foster mother.

Ms. Beaver indicated that the [C]hildren have special needs. The minor child, J.S.C., was diagnosed with attention deficit hyperactivity disorder, post-traumatic stress disorder[,] and intermittent explosive disorder. The minor child, C.A.C., was diagnosed with adjustment disorder, anxiety[,] and depression. The child[,] K.A.W.[,] was diagnosed with post-traumatic stress disorder, reactive attachment disorder, adjustment disorder[,] and is also on the autism spectrum. The fourth minor child, R.E.W., was diagnosed with adjustment disorder, reactive attachment disorder[,] and post-traumatic stress disorder. Ms. Beaver stated that all the minor [C]hildren are on various medications prescribed to them.

Ms. Beaver also testified that the foster parents meet the [C]hildren's emotional needs. Ms. Beaver indicated that the foster parents provide the [C]hildren with a safe and loving environment. Ms. Beaver described the parents as having a positive parental bond with the [C]hildren. The [C]hildren referred to their foster parents as "[M]om" and "[D]ad[."] The [C]hildren are also involved in trauma counseling.

> Ms. Beaver testified that there is a very strong[,] loving bond between the foster parents and the [C]hildren. According to Ms. Beaver, the two older children, C.A.S. and J.S.C.[,] have expressed a strong desire to be adopted by the foster parents. With respect to the younger children, K.A.W. and R.E.W., Ms. Beaver stated that there is a nurturing and strong bond between the two children and the foster parents. The [C]hildren are constantly hugging the foster mother and telling both parents that they love them.

*Id.* at 27-28 (citations to record omitted).

> By contrast, the orphans' court observed:

> Ms. Beaver testified that there is not a strong bond between [Mother and Father] and the [C]hildren. Ms. Beaver indicated that the relationship between … [M]other and the [C]hildren is very "forced[."] [She] stated that often the minor [C]hildren do not wish to talk to … [M]other[,] and it is a "struggle" to get the [C]hildren to speak to [her] on video….

> Ms. Beaver believed that should the court terminate … Mother's parental rights, the [C]hildren [would] not suffer any detrimental effects or any harmful effects. Ms. Beaver believed that the [C]hildren [would be] able to heal from the trauma and move forward in their lives. Ms. Beaver indicated that the foster parents wish to adopt the minor [C]hildren. The foster parents understand that should they be permitted to adopt the [C]hildren, the [C]hildren would have all rights to them as their biological [C]hildren [and] … could inherit from their estate. Ms. Beaver testified that she did not have any concerns or reservations over the foster parents adopting the [C]hildren.

*Id.* at 29 (citations to record omitted). The record clearly reflects that termination of Mother's parental rights would serve the needs and welfare of the Children. Accordingly, we conclude that the orphans' court's determinations regarding section 2511(a)(8) are supported by sufficient, competent evidence in the record.

Finally, having determined that the requirements of section 2511(a) have been satisfied as to Mother and Father, we address Mother's and Father's claims regarding the termination of their parental rights under section 2511(b). Father claims that the orphans' court abused its discretion in finding that it was in the Children's best interest to terminate his parental rights under section 2511(b), without considering "the significant obstacles posed by CYS." Father's Brief at 12. Father avers that after the Children's placement in January of 2018, he was ordered "to continue his mental health, do parenting and obtain and maintain safe and stable housing." *Id.* (brackets omitted). He claims that "from the outset, [he] was 'very cooperative' with CYS, signing releases, permitting access to his home and generally 'starting off on a good track[.'"] *Id.* (brackets omitted). He further asserts that he was actively engaged in parenting education and mental health services, but that his relationship with CYS "soured" in May of 2018, when he was incarcerated. *Id.* at 12-13. Father claims that "CYS elected to, in essence, ignore [him,]" as it "embarked upon a strategy to weaken the relationship between [Father] and his [C]hildren and … to strengthen its argument that the [C]hildren's best interests would be served in terminating his parental rights." *Id.* at 13.

Father's entire argument regarding the termination of his parental rights under section 2511(b) is devoid of any legal analysis. He fails to argue that he has an emotional bond with the Children and fails to explain how the termination of his parental rights would negatively impact them. Rather, he merely attempts to shift the blame for his lack of contact with the Children to

CYS, by listing numerous examples of what he perceives to have been a "ploy" by CYS to weaken his relationship with the Children. *Id.* at 14. *See also id.* at 15 (Father's concluding that "CYS's dilatory tactics have resulted in [his] having no contact whatsoever with K.A.W. and R.E.W."). Thus, we deem Father's claim regarding the orphans' court's findings under section 2511(b) to be waived. *See* Pa.R.A.P. 2119(a) (stating that the argument shall include "discussion and citation of authorities as are deemed pertinent"); *In re Adoption of A.P.*, 920 A.2d 1269, 1275 (Pa. Super. 2007) (concluding that the failure to properly develop or cite any legal authority in support of an argument results in waiver); *Estate of Haiko v. McGinley*, 799 A.2d 155, 161 (Pa. Super. 2002) ("Without a reasoned discussion of the law … our ability to provide appellate review is hampered. It is not this Court's function or duty to become an advocate for the appellant.").

Nevertheless, even if Father had not waived this issue, we would conclude that his claim is meritless. No evidence has been produced to establish the existence of a bond between Father and his Children. In fact, Ms. Beaver indicated that she did not believe there was any relationship between the Children and Father. *See* OCO at 29. She testified that "the [C]hildren have not had contact with … [F]ather for three years[,] and he has not performed any parental role to them." *Id.* As such, Ms. Beaver believed that the Children would not suffer any detrimental effects from the termination of Father's parental rights. *Id.* Additionally, we note that Father's lack of contact with his Children was through his own fault. A "no contact" order was

issued by the court to protect the Children, because they were the victims of Father's abuse. *See* N.T., 12/21/20, at 85-86 (Ms. Neubauer's testifying that the orphans' court initially ordered "no contact" at the dependency hearing and that the criminal court subsequently issued another "no contact" order); Sentencing Order (single page) ("No contact with victims[.]"). The Children are currently thriving under the care of the foster parents. The record supports the orphans' court's finding that the foster parents are able to meet the physical, emotional, and developmental needs of the Children. Thus, we would discern no abuse of discretion or error of law by the orphans' court in its determination that terminating Father's parental rights is in the best interest of the Children.

As to Mother's claim regarding the section 2511(b) analysis, she avers that there was insufficient evidentiary support for the orphans' court's finding that it is in the Children's best interest to terminate her parental rights. Mother's Brief at 17. Mother argues that she is aware of the Children's special needs and that she is currently able to provide for their physical, developmental, and emotional needs in New York. *Id.* at 21. "Her plan is to have the [C]hildren evaluated at Bellevue Psychiatric [H]ospital and enroll them in school." *Id.* She further acknowledges that "the Covid-19 pandemic has strained the bond between her and her [C]hildren," but states that "a bond remains and will continue." *Id.* Finally, Mother expresses some concern with continued placement in the foster home due to an alleged inconsistency

with the Children's therapy services.  *Id.* at 19.  We deem Mother's claim to be wholly without merit.

As summarized by the orphans' court,

> Mother was given ample time to address and remedy her problems[] but has failed to successfully do so.  [She] failed to remedy her mental health issues, substance abuse issues[,] and has failed to complete her parenting education[] without concerns.  The [c]ourt finds that … Mother … [is] not able to meet [the] [Children's] needs.  In stark contrast, the foster parents have amply demonstrated that they meet the physical, developmental[,] and emotional needs of the minor [C]hildren who have thrived under their care.

OCO at 32.  As there is competent evidence in the record to support the orphans' court's credibility and weight assessments regarding the Children's needs and welfare, and the absence of any bond with Mother, we conclude that the orphans' court did not abuse its discretion as to section 2511(b).

Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights to all four Children, pursuant to 23 Pa.C.S. § 2511(a)(8) and (b), and the decrees involuntarily terminating Father's parental rights to his children, K.A.W. and R.E.W., pursuant to 23 Pa.C.S. § 2511(a)(9) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/11/2022

- 28 -